IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| S. RYAN WHITE, | ) |
| Petitioner | ) |
| | ) Case No. 3:25-cv-00556 |
| v. | ) |
| | ) JUDGE CAMPBELL |
| MICAH LAUREN STOVER, | ) MAGISTRATE JUDGE HOLMES |
| Respondent. | ) |

## MEMORANDUM AND ORDER

Petitioner S. Ryan White claims Respondent Micah Lauren Stover brought their sons E.G.W. and A.S.W. to the United States for what was supposed to be a two-week trip and refused to return them to their home in Puerto Vallarta, Jalisco, Mexico. Pending before the Court is Petitioner's Verified Complaint and Petition for Return of Child pursuant to the Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act seeking an order to return the child to Puerto Vallarta, Jalisco, Mexico for a custody determination by the courts there. (Doc. No. 1).

Petitioner initiated this action on May 15, 2025. (*Id*.). After some difficulty serving the Petition on Respondent (*see* Doc. No. 7), the summons was executed on July 31, 2025 (*see* Doc. No. 13). After a period of time for the parties to conduct limited discovery, the Court held a hearing on October 27, 2025, and November 2, 3, and 7, 2025. Following the hearing, the parties filed post-hearing briefs. (Doc. Nos. 66, 67).

For the reasons stated herein, the Petition for return of E.G.W. and A.S.W. to Mexico is **GRANTED**.

## I. FINDINGS OF FACT

White and Stover are married and are the parents of three minor children: sons E.G.W. (age 9) and A.S.W. (age 7), and daughter E.L.W. (age 1). The two oldest children were born in the United States and are U.S. citizens. The youngest child was born in Mexico and is a Mexican citizen.[1] White and Stover are both U.S. citizens.

White, Stover and the sons moved from Portland, Oregon, to Puerto Vallarta, Jalisco, Mexico, in June 2019, when the sons were three and one years old, respectively. They lived in Mexico continuously until February 2025 when Stover and the sons traveled to Nashville, Tennessee. White and the youngest child continue to reside in Mexico. The parties and the sons have resided in Mexico on temporary visas.

The family did things one would expect to settle into life in a new place. They rented houses,[2] got a dog, enrolled the children in schools, made friends, obtained medical care when necessary, and built a life in Mexico. The children had friends and nannies, participated in organized sports, and went to birthday parties. Both children are bilingual. White and Stover maintained ties with the United States; they traveled to the United States for work and family visits, kept personal items in storage, paid taxes, and had drivers' licenses, passports, and bank accounts in the United States. Although White and Stover traveled to the United States, between their arrival in Mexico in June 2019 until a trip to Portland, Oregon, for two weeks in December 2024 / January 2025, the sons never left Mexico.

---

[1] The couple is in the process of finalizing adoption of E.L.W. and are engaged in legal proceedings in Mexico regarding E.L.W. The status of these proceedings is not entirely clear but is not dispositive of any issue before the Court. Both parties have legal counsel in Mexico.

[2] During their time in Mexico, the parties lived in several different houses in Nayarit and Jalisco, neighboring states on the west coast of Mexico.

By the fall of 2024, White and Stover's relationship had deteriorated. The sons were struggling with anxiety, panic attacks, and bed wetting. Stover claims White was emotionally and physically abusive – specifically that White screamed at them, made unkind remarks (he called Stover a "bitch" and E.G.W. a "sociopath"), and, on separate occasions, threw the oldest son into a bed and punched him in the arm leaving a mark. White describes the "punch" as "not a rage-filled hit," but rather a misguided attempt to startle E.G.W. into stopping his own aggressive behavior. Some aspects of Stover's recitation of events are undisputed and/or corroborated by text messages between the parties, but White claims Stover's telling of events is exaggerated. A next-door neighbor testified that White was an active and caring father, that she never heard him yell at the children, but that she heard Stover screaming at the children on multiple occasions. These incidents peaked in November / December 2024. White and Stover separated in December 2024.

They continued to co-parent the children and began discussing the possibility of moving to the United States. In mid-February, they signed a "Family Agreement" that included agreements on financial arrangements, parenting time, and other matters. (White Ex. 10; Stover Ex. 44). The Family Agreement referred to an "upcoming trip in February 2025." It also states that "between 2/2025 & 6/2025: Micah to take boys on trips as needed" and "[a]fter end of school year → Micah to take boys for the summer either to Nashville or Denver …[l]ocations determined by work opportunities and cost analysis … [d]epending on how the summer goes and based on educational opportunities available there is potential to spend one school year in US." (*Id*.).

On February 20, 2025, Stover and the sons travelled to Nashville, Tennessee, to promote Stover's recently published book, *Healing Psychedelics – Innovative Therapies for Trauma and Transformation*, and to visit family. White consented to the trip based on Stover's representation that it would last two weeks. Stover and the sons had return plane tickets for March 5, 2025. When

3

the original return flight was cancelled due to weather, Stover initially said she would reschedule the return flight for March 8, 2025, but then cancelled the flight and refused to return.

On or about March 17, 2025, the lease on Stover's house in Mexico ended, so Stover returned to Mexico without the sons to move out of the house. On or about the same date, she signed a one-year lease on an apartment and enrolled the sons in school in Nashville. (Stover Ex. 57). On March 24, 2025, White expressly demanded she return to Mexico with the sons. (White Ex. 3 at RWhite_8049). He wrote: "You left under the agreement you were returning on March 5th. You do not have my permission to stay in Nashville. You need to return the boys to Mexico immediately." (*Id*.). Stover responded, "I don't need your permission to remain in Nashville." (*Id*.). Stover refused to tell White where she and the sons were living. (*Id*.). During her testimony, Stover admitted that that White did not agree for the sons to remain in Nashville.

Initially, Stover allowed White to talk to the sons through telephone and video calls, but eventually she cut off all communication. Since traveling to the United States with the sons in February, Stover has returned to Mexico without the sons in March, May, and June. On May 15, 2025, White filed a petition seeking return of the sons to Mexico under the Convention on the Civil Aspects of International Child Abduction.

White has since filed for divorce in Mexico. Stover has filed for divorce in Tennessee and obtained a protective order against White in Mexico. Both parties have legal counsel in the United States and in Mexico.

4

## II. LEGAL STANDARD

This matter arises under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq*. "The Hague Convention was adopted by the signatory nations 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986)). "It is the Convention's core premise that 'the interests of children … in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (citing Hague Convention Preamble).

Mexico and the United States are signatories to the Hague Convention. (Joint Stipulation ¶ 3). Congress ratified and implemented the Hague Convention by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, which sets forth procedures for implementation of the Convention in the United States and grants the United States District Courts jurisdiction over actions arising under the Convention. 22 U.S.C. §§ 9001(b), 9003. ICARA requires that the Petitioner establish that the child has been wrongfully removed from its place of habitual residence within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

"[A] child wrongfully removed from [its] country of 'habitual residence' ordinarily must be returned to that country" unless one of the narrow exceptions set forth in the Convention applies. *Monasky*, 589 U.S. at 70-71. Three of these exceptions are relevant here. First and second, a court

5

is not required to order the return of the children if the person who opposes return establishes by a preponderance of the evidence that: (1) the petitioner "consented to or subsequently acquiesced in the removal or retention"; or (2) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13; 22 U.S.C. § 9003(e)(2)(B). Third, a Court is not required to return wrongfully removed children to the place of habitual residence if "there is a grave risk that [their] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Hague Convention, Art. 13(b); *see also Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022). The party seeking to avoid removal must demonstrate this exception applies "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

### III. ANALYSIS

#### A. Wrongful Removal from the Place of Habitual Residence

Petitioner must establish that the children were wrongfully removed or retained from their place of habitual residence within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

Under the Hague Convention, the removal or retention of a child is wrongful when:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3.

Unsurprisingly, "[t]he most important determination that a court makes when resolving a petition brought pursuant to the Hague Child Abduction Convention is that related to a child's

6

place of habitual residence." *Rodrigues Dos Santos Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901 at *3 (6th Cir. Jul. 20, 2023). Accordingly, the Court begins there.

"Habitual residence" is not defined by the Convention. Instead, the Court must engage in a fact-driven inquiry to determine the place where the child is "at home" at the time of the retention or removal. *Monasky*, 589 U.S. at 77 (citing *Karkkanien v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)). As the Supreme Court recently explained:

> [b]ecause locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Id.* at 78 (internal citations omitted). A child's residence in a particular country is "habitual" only if it is more than transitory. *Id.* at 76. It is not dependent on agreement between the child's parents, but "'mere physical presence' … is not a dispositive indicator of an infant's habitual residence." *Id.* at 77, 81. Instead, the Court looks to "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place" to determine whether an infant's residence in that place has the quality of being habitual. *Id.* at 81. Ultimately, the goal is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum – the country where the child is at home." *Id.* at 79.

Habitual residence is determined at the time immediately prior to the wrongful removal or retention. Here, the evidence shows that the sons were expected to return to Mexico from what

was to be a two-week trip with Stover in early March. Instead, they remained in the United States. The date of retention is, therefore, approximately March 8, 2025, the date they were scheduled to return to Mexico (taking into account weather delays) and did not do so.

The determination of habitual residence is not difficult in this case. The evidence unequivocally shows that the sons' place of habitual residence was Mexico. They lived in Mexico for six years, which at their young ages of seven and nine is the vast majority of their lives. Indeed, given their young ages and the length of time in Mexico, it is unlikely that the sons have memories of their lives anywhere else. That they lived in various residences and attended various schools (all of which were in the same general region of Mexico) has no bearing on the determination that their habitual residence was Mexico. Similarly, the fact that the sons' parents maintained connections with the United States or one day planned to return to the United States has little to no impact on whether the sons were "at home" in Mexico. Parental agreement or intent is most relevant when considering the habitual residence of infants, which E.G.W. and A.S.W. are not. Even so, the evidence suggests that White and Stover moved to Mexico with no fixed duration in mind. They even considered applying for permanent residency several times during the six years they lived there and made various inquiries about obtaining permanent residency status. Stover's testimony that she never intended to stay in Mexico as a single parent does not undermine the abundance of connections the children had in Mexico or the conclusion that Mexico was their habitual residence when they were retained in the United States.

The next consideration is whether the retention was "in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident." The Court takes judicial notice of the law under the Civil Code for Jalisco, Mexico, as permitted by the Hague Convention, Article 14. Under

Mexican law, both parents possess equal custody and decision-making rights under the doctrine of *patria potestad*. (*See* Excerpt of Civil Code for the States of Jalisco, Mexico, Doc. No. 60-1 (Spanish), 60-2 (translation)); *see also*, *March v. Levine*, 136 F. Supp. 2d 831, 842 (M.D. Tenn. 2000) ("By law, the right to patria potestad belongs to both parents.").

There are no custody orders regarding the sons, therefore the parties have equal custody rights. Under the Convention, "rights of custody" include rights relating to the care of the child and the right to determine the child's place of residence. Hague Convention, Art. 5(b). Therefore, Stover's retention of the sons in the United States is in breach of White's rights of custody. Finally, there is no genuine dispute that White was exercising custody at the time of removal or retention.

White has established by a preponderance of the evidence that the sons' place of habitual residence is Mexico and that they were wrongfully retained from Mexico. Thus, those children must be returned to Mexico unless the Respondent shows that one of the exceptions applies. Stover asserts three exceptions: consent, the children's objection, and grave risk of harm. The Court considers each in turn.

**B. Consent**

Article 13 of the Hague Convention provides that the Court is not required to order the return of the children to Mexico if White "consented to or subsequently acquiesced in the removal or retention." Hague Convention, Art. 13(a). Under the Hague Convention, the defense of consent requires the respondent to establish, by a preponderance of the evidence, that the petitioner agreed to the removal or retention of the child. 22 U.S.C. § 9003(e)(2)(B); *Friedrich v. Friedrich*, 78 F.3d at 1060, 1067 (6th Cir. 1996). The Sixth Circuit has held that "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent

attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070 (footnotes omitted).

Stover points to evidence that she and White signed the Family Agreement, which, among other things, memorialized the parties' understanding regarding the sons' trip to the United States in February 2025. Stover argues that the Agreement is evidence of White's consent for the sons to relocate to the United States. The Court disagrees. First, the evidence shows that White consented to the sons traveling to the United States for approximately two weeks. Stover and the children had plane tickets for return to Mexico on March 5, 2025. Second, the Family Agreement does not indicate agreement to relocation in the United States. It refers to the travel as a "trip," and indicates that although permanent relocation is something the parties were considering, they had not reached agreement on that issue. (*See* Agreement, Stover Ex. 44). The Agreement provides that Stover and the sons will take "trips as needed" between February and June 2025. The Agreement further provides that Stover would take the sons to either Nashville or Denver "[a]fter end of school year" and that "[d]epending on how the summer goes and based on educational opportunities available → there is potential to spend one school year in US." The reference to a "potential move" at some point in the future is not indicative of consent for the children to remain in the United States past the original date of return. Nor does the consent to "trips as needed" during a specified period indicate consent to a permanent move to the United States or even a months-long temporary relocation. A "trip" does not typically involve a one-year lease and school enrollment in another location.

Further, Stover testified that after she was in the United States she attempted to communicate with White her view that the sons needed to stay in the United States, but that he did not agree to them staying. She testified, "He did not agree." Indeed, once White learned Stover

had rented an apartment in Nashville, he was unequivocal that he did not consent to the sons remaining in the United States. On March 24, 2025, he wrote: "You do not have my permission to stay in Nashville. You need to return the boys to Mexico immediately." (White Ex. 3 at RWhite_008049).

On this record, the Court has no trouble concluding that White did not consent to E.G.W. and A.S.W. remaining in the United States beyond the duration of the planned trip with a slight extension for unforeseen weather delays.

C. **Mature Age**

The Hague Convention authorizes a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13. Dr. Allson Bender, who testified as a forensic psychologist, and Stover testified that the boys object to returning to Mexico. The question is whether E.G.W., who is nine years old, and A.S.W., who is seven years old, are of sufficient age and maturity for the court to take account of their views. Dr. Bender testified that they are "very bright children" and are "able to articulate their thoughts and feelings consistently and in their own words." The Court denied Stover's request to conduct an *in camera* interview of the children. The Court finds that regardless of maturity, seven and nine is not a sufficient age for a child to determine where he will live.

The record also supports this conclusion. The sons, while very bright, have not attained requisite maturity for their objection to be determinative. In fact, Dr. Bender describes their maturity as "age-appropriate." During interviews with Dr. Bender, E.G.W., the older of the two boys, separated from his mother with "minor reluctance," only separated from his brother with "coaching and reassurance," and during one of the sessions was accompanied by "therapist"

11

Michelle Jones in an attempt to increase his comfort level.[3] (Bender Forensic Evaluation, Appendix B). A.S.W., the younger boy separated from his mother with "minimal distress." (*Id.*). Dr. Bender also observed that E.G.W.'s "responses about his father could have contained language that has been influenced by others, particularly related to legal matters, as he appeared to be aware of specific legal details about the custody situation." (*Id.*). Given the sons' young ages and that they have been in the sole custody of their mother, with minimal contact with their father, since February 2025, and considering Dr. Bender's Report and interview notes, the Court has significant concerns that the sons are impressionable, in part because of their age.

In summary, the Court concludes that E.G.W. and A.S.W. have not attained an age or degree of maturity at which is appropriate to consider their views and to refuse to order their return based on their preference for remaining in the United States with their mother.

## D. Grave Risk of Harm or Intolerable Situation

The Hague Convention provides that the Court is not bound to order the return of the children of the person opposing their return establishes that there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b). The Respondent must establish a "grave risk of harm" by the heightened standard of clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). "The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule … that [c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned.'" *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 and 1067 (6th Cir. 1996)); *see also* 22 U.S.C. § 9001(a)(4) ("Children who are

---

[3] Although Respondent refers to Michele Jones as the children's "therapist," Ms. Jones is not a licensed therapist. Respondent also requested the court allow Ms. Jones to accompany the children to provide emotion support during any *in camera* interview. (*See* Doc. No. 29).

wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

The Sixth Circuit has provided the following guidance for a court's determination on the grave risk of harm exception:

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.
>
> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich*, 78 F.3d at 1068–69 (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)). In *Friedrich*, the Sixth Circuit further found that a grave risk of harm can exist in two situations. "First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease." *Id.* at 1069. "Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id*. Only the second situation is at issue here.

> In a Hague Convention case, our precedent establishes three broad categories of abuse: minor, clearly grave, and cases in the middle, in which the abuse "is substantially more than minor, but is less obviously intolerable." *Simcox*,

13

> 511 F.3d at 607–08. A case involving relatively minor abuse would likely not pose a grave risk to the child nor place the child in an intolerable situation. *See id.* at 607. In such cases, the district court has no discretion to refuse the petition to return because the Article 13(b) threshold has not been met. *Id*. A case in which the abuse is clearly grave typically involves "credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id*. at 607–08. Cases in the middle category call for a fact-intensive inquiry into "the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* at 608.

*Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022).

Stover asserts that she and the sons were subjected to physical and psychological abuse from White, and due to traumatic events in Mexico, the majority of which she contends were "at the hands of [White]," they suffer PTSD symptoms such that their return to Mexico poses a grave risk of psychological harm. (*See* Doc. No. 56 at ¶ 117, Doc. No. 67 at ¶ 18). Stover points to Dr. Bender's Forensic Report and testimony that the sons would face psychological harm if returned to Mexico. Dr. Bender opined that E.G.W. "displays the full range of PTSD symptoms" and that A.S.W. has "adjustment disorder with anxiety." (Bender Report, Stover Ex. 113). Stover argues that the past physical and psychological abuse, the professional diagnosis of PTSD, and the expert opinion that repatriation would trigger a recurrence of trauma establish that return to Mexico would place the sons in an intolerable situation. (Doc. No. 56 at ¶ 118).

White argues that Dr. Bender's conclusions should be viewed critically because her "conclusions regarding the children's purported fear of Father and desire not to return appear grounded primarily in Respondent's self-generated accounts rather than in independent, spontaneous statements by the children." (Doc. No. 66 at 9). White adds that, to the extent Stover's concerns are justified, the courts in Mexico are competent to address any custody or safety concerns. (*Id.*).

14

Case 3:25-cv-00556    Document 68    Filed 11/14/25    Page 14 of 17 PageID #: 861

The evidence at trial indicates that the alleged abuse consists of White screaming at Stover and the children (one time calling Stover a "bitch"), one event when White "punched" A.S.W. in the arm, and one time when White threw or slung A.S.W. into the bed. Stover claims the physical events left red marks, but she did not take photographs or report the incidents to the police. Stover also testified that White showed preferential treatment of A.S.W. over E.G.W. leading the boys to wonder why their father treated them differently. Stover stated that these incidents were the worst of White's conduct and that it peaked in November and December 2024 shortly before White moved out of the family home. When asked why she allowed their daughter to stay with White, she responded that she did not have concerns because White was affectionate and nurturing with the daughter. The sons were also affected by bullying events at school involving E.G.W., the theft of a backpack which occurred while E.G.W. was on an outing with White, and stress related to the dissolution of the family.

Depending on whose version of the story is credited, these events are either minor or in the middle on the scale of abuse. Even if the events occurred as Stover has described and fall in the middle of the scale, the Court must examine whether there are any measures that would sufficiently ameliorate the risk of harm to the sons caused by their return. The answer here is clearly "yes." Both parties are represented by counsel in Mexico, and Stover has demonstrated that she can obtain a restraining order from the courts in Mexico, if necessary. In addition, the parties have previously engaged the assistance of numerous professionals in Mexico to guide their parenting and custody decisions. Continued engagement with these professionals will minimize psychological harm. Moreover, an order returning the sons to Mexico is not a custody determination or an order that the children must reside with White or even spend time with him; it is merely an order that a court in Mexico, not the United States, must decide these issues.

The Court reaches the same conclusion with regard to Dr. Bender's recommendation that the sons should not return to Mexico to prevent re-exposure to trauma.[4] Ameliorative measures will reduce the risk of psychological harm from a return to Mexico. Such measures include, but are not limited to, treatment from the children's therapists and other professionals in Mexico, the use of the courts in Mexico to resolve custody and visitation issues, and, if necessary, the use of the courts in Mexico to obtain a restraining order. Again, the Court notes that both parties are represented by counsel in Mexico and that Stover's attorney testified that it is possible to obtain a protective order in absentia.

Because such ameliorative measures are available, the Court finds Stover has not shown clear and convincing evidence of a grave risk that return to Mexico will expose the sons to physical or psychological harm or otherwise place them in an intolerable situation.

## IV. CONCLUSION

For the reasons stated, the Court finds that Petitioner has established that E.G.W. and A.S.W. were wrongfully retained from their habitual residence in Puerto Vallarta, Jalisco, Mexico, and that no exceptions apply. Those children must, therefore, be returned to Mexico immediately. From the evidence admitted during the hearing, it appears the parties have the financial means to arrange for the sons' prompt return and for Stover to accompany them and arrange accommodations in Mexico if she choses to do so. The Court's order is limited to its jurisdiction

---

[4] The Court notes that Dr. Bender's conclusions that the sons' symptoms are attributable to White's conduct are largely based on Stover's reporting. For example, Dr. Bender cites "the robber-hunt incident" in which "Father took [E.G.W.] along to confront armed robbers," but E.G.W. said only that some men stole his father's backpack. (Stover Ex. 113, Bender Report, *Findings and Impressions* at 10-11, and *Interview Summary of E.G.W.* at 46). The characterization of this event appears to have come from Stover and differs in important respects from White's. Numerous other statements in Dr. Bender's Report that are attributed to the sons come not from the sons directly, but from Stover.

under ICARA, ordering the prompt return of the children. E.G.W. and A.S.W. must be returned to Mexico promptly within 30 days of the date of this Order. The parties shall meet and confer regarding the details of return and no later than December 1, 2025, and file a Notice providing the details of their return travel. Upon review of that notice, the Court will advise Respondent concerning return of passports held by the Court pending this ruling.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE